**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

No. _____

| | | |
|---|---|---|
| ATLAS POWER TECHNOLOGIES INC., a British Columbia corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| SIDNEY W. HINTON, UTILITY INNOVATION HOLDINGS, INC., a Delaware corporation, UTILITY INNOVATION GROUP, LLC, a North Carolina limited liability company, and GRIDSURE, LLC, a North Carolina limited liability company, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## VERIFIED COMPLAINT

Plaintiff Atlas Power Technologies Inc. ("Atlas"), by and through its attorneys, files this Verified Complaint against its director, Sidney W. Hinton ("Hinton"), and three (3) companies controlled by Hinton – Utility Innovation Holdings, Inc., Utility Innovation Group, LLC, and GridSure, LLC (collectively these three entities are referred to as "UIG" and together, Hinton and UIG are referred to as the "Defendants"), for injunctive and other relief arising from Defendants' blatant misappropriation of Atlas's trade secrets.

## NATURE OF THE DISPUTE

1.     Atlas is an energy company formed under British Columbia law that has spent years researching and developing new supercapacitor energy-storage technologies that are essential for managing electrical power systems, including for artificial intelligence ("AI") data centers.

1

2.  Hinton abused his position as a director of Atlas and breached his fiduciary and contractual duties to Atlas by misappropriating Atlas's new technology for the benefit of his own businesses, UIG.

3.  Specifically, and unbeknownst to Atlas until very recently, upon information and belief, Hinton secretly transferred Atlas's new technology, a unique control and management technology for grid-scale energy storage systems for AI data centers (the "Energy Storage Control System") to his own companies, UIG.

4.  Atlas's Energy Storage Control System has the ability to solve a major problem with AI data center power systems by smoothing out fluctuating power characteristics caused by fluctuations in these data centers' electrical load.

5.  After Hinton transferred Atlas's Energy Storage Control System technology to UIG, upon information and belief, Hinton formed a partnership with Atlas's primary hardware supplier ("Supplier-1"), to target the AI data center market using a product incorporating Atlas's misappropriated Energy Storage Control System technology and Supplier-1's hardware.

6.  UIG has announced its intention to launch its product using Atlas's misappropriated technology **before the end of 2025.** In other words, absent injunctive relief the product **will be shipped at some point in the next four weeks**.

7.  Defendants' misappropriation of Atlas's highly confidential information and trade secrets, all for Hinton's personal benefit and the benefit of his UIG companies, poses an existential threat to Atlas's business, including its relationships and prospective economic advantage in the AI data center market.

8.  To protect Atlas against the irreparable harm it is facing, and remedy any harm

2

that has already occurred, this action seeks preliminary and permanent injunctions to halt the use of the misappropriated technology and for violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1832, 1836 *et seq*. (the "DTSA"), the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 *et seq*. (the "TSPA"), and Hinton's breach of his fiduciary duties to Atlas under British Columbian law, as well as monetary damages.

## THE PARTIES

9.     Plaintiff Atlas is a corporation formed under the laws of British Columbia with its principal place of business located at 31632 Marshall Road, Abbotsford, British Columbia, Canada.

10.     Upon information and belief, defendant Hinton is a North Carolina citizen who resides in Wake County. Hinton is a director and shareholder of Atlas, as well as the UIG defendant companies.

11.     Upon information and belief, defendant Utility Innovation Holdings, Inc. ("UIHI") is a Delaware corporation with its principal place of business located at 702 Oberlin Road, Suite 230, Raleigh, North Carolina 27605. Hinton is an executive officer and director of UIHI, which is part of UIG.

12.     Upon information and belief, defendant Utility Innovation Group, LLC ("UIGLLC") is a North Carolina limited liability company with its principal place of business located at 702 Oberlin Road, Suite 230, Raleigh, North Carolina 27605. Hinton is a manager of UIGLLC, which is a part of UIG.

13.     Upon information and belief, defendant GridSure, LLC ("GridSure") is a North Carolina limited liability company with its principal place of business located at 702 Oberlin Road, Suite 230, Raleigh, North Carolina 27605. Hinton is a manager of GridSure, which is a

3

part of UIG.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) by virtue of claims asserted under the DTSA.

15.     Supplemental jurisdiction exists over Atlas's state law and British Columbian law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the federal claim that they form part of the same case or controversy.

16.     This Court has personal jurisdiction over Hinton because, upon information and belief, he is domiciled in North Carolina and committed most of his wrongful actions in North Carolina.

17.     This Court has personal jurisdiction over UIHI, UIGLLC, and GridSure (collectively, "UIG") because, upon information and belief, their principal place of business is located in North Carolina such that they are domiciled in North Carolina, and their wrongful conduct occurred primarily in North Carolina.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the acts, omissions and transactions giving rise to Atlas's injury occurred in this district, and all Defendants are domiciled in this district.

**FACTS**

**A. Atlas's Energy Storage Control Solutions Business**

19.     Atlas was founded by Mitchell Miller in 2016 as a clean-energy company developing advanced supercapacitor energy-storage technologies.

20.     Atlas focuses on delivering high-power, fast-response energy storage and control

4

solutions specifically designed for AI data centers throughout the United States and Canada.

21.     To develop and market these energy storage and control technologies, Atlas has invested tens of millions of dollars into research and development, and spent years forming relationships with universities, businesses, and suppliers in the new business of AI data centers.

22.     AI data centers utilize a huge amount of energy and experience extreme and rapid power swings, high peak demand, and have strict uptime requirements.

23.     As this industry grows, Atlas has devoted its resources to creating new energy storage and control technologies to address these unsolved problems.

**B. The Atlas Trade Secrets**

24.     To run an AI data center, it is necessary to have a power system that generates and delivers a massive and fluctuating amount of electricity that changes very rapidly based upon how much computational power the large amount of processors need at any given time.

25.     Companies such as Google and Apple already operate energy-intensive data centers in North Carolina, and the largest data center currently under construction outside of Charlotte is estimated to require up to 400 MW of power on demand.

26.     However, the power systems delivering this electricity experience challenges servicing these fluctuating loads, which can result in power supply interruptions, depending on how the data center processors are performing calculations, and the power demands are changing rapidly, in these AI data centers.

27.     Managing and controlling the severity of these power fluctuations is an unresolved issue in AI data center power systems that Atlas has been working to address.

28.     In 2022, Atlas began developing a supercapacitor-based Energy Storage Control System that included Atlas generation 1 control system, a unique high-power product that was designed for rapid response and offered high cyclability. This system would later be improved

5

further in Atlas generation 2 control system by further improving on the generation 1 control system. The generation 2 control system offered a more advanced control system with unique innovative features that was designed specifically for the management of these AI-caused power fluctuations.

29.    The Atlas generation 2 control system was designed specifically to stabilize the power system of AI data centers, offering a more efficient and effective solution than known commercial products.

30.    The Energy Storage Control System provides control and management technology for grid-scale energy storage systems, including for AI-driven data centers.

31.    The Energy Storage Control System is the first product of its kind utilizing its unique features to enter the market that can address the load variability of AI data centers.

32.    ████████████████████████████████████████
████████████████████████████████████████████████
███████████████████

33.    Atlas took careful and deliberate measures at each stage of the Energy Storage Control System's design and creation to keep this technology highly secret and confidential throughout the entire research and development process, including subjecting it to the utmost protections from disclosure to anyone other than those with a strict need to know.

34.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

35.    This intentional and unconventional step allowed Atlas to fully develop its core control logic without exposing its proprietary methods or enabling any outside parties to reverse-

6

engineer the concepts before Atlas's intellectual property could be perfected and protected.

36.     The end product of this research and development, which took several years for generation 1, and nearly one (1) year for generation 2, and cost tens of millions of dollars, is the proprietary, highly confidential system architecture and control structure embodied in Atlas's Energy Storage Control System.

37.     In addition to these measures, Atlas committed substantial time and resources to securing international patent protection for its Energy Storage Control System, starting in early 2025.

38.     ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

39.     ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████

40.     ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████

41.     ███████████████████████████████████████████

42. ████████████████████████████████████████████████

████████████████████████████████████████████████

███████

43. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

44. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████

45. ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

46. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████

47. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

48. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

49. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

50. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████

51. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

52. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

53.    Atlas devotes significant resources, personnel, and funding to creating and developing the Atlas Trade Secrets.

54.    The Atlas Trade Secrets have significant value to Atlas and are not generally known in the marketplace. Atlas derives a significant economic benefit by virtue of this information being kept secret.

55.    Atlas takes many precautions to prevent unauthorized access, disclosure, and use of the Atlas Trade Secrets, including confidential information concerning the Energy Storage Control System developed by Atlas through research and development, and testing and refinement of the Energy Storage Control System.

56.    Atlas takes reasonable steps to maintain the confidentiality and secrecy of the Atlas Trade Secrets, including by limiting access to this information to a small group of individuals who have a specific need to know, and this information is not generally known outside of the company.

57.    Technical details related to the Atlas Trade Secrets, including technical updates on the Energy Storage Control System's development and refinement, internal analyses, and development progress, were contained only within board materials, director updates via weekly team meeting technical briefs, and select management communications that were exclusively provided to Atlas's directors and a very limited number of executives or administrative personnel, all of whom were required to keep Atlas's confidential information and the Atlas Trade Secrets confidential under binding non-disclosure agreements executed in connection with

10

their employment or shareholder or director duties.

58.     Weekly meeting technical brief minutes were similarly restricted to prevent dissemination beyond the individuals who required access for governance or operational oversight.

59.     These measures ensured that Atlas's Trade Secrets and the development of the Energy Storage Control System remained highly confidential, proprietary, and protected throughout its evolution.

60.     As a result of its investment in the Atlas Trade Secrets, Atlas has a competitive advantage not available to the public or any other people or businesses who do not possess the Energy Storage Control System.

61.     It would be difficult, if not impossible, for someone else to recreate the Atlas Trade Secrets without obtaining Atlas's confidential information concerning the Energy Storage Control System, its research and development, ███████████████████████████████ ██████████████████.

62.     At a minimum, it would require years of expense and effort to recreate even the most basic aspects of the Energy Storage Control System.

63.     The Energy Storage Control System gives Atlas a competitive advantage in a highly competitive industry, where the first company to offer an effective solution to the AI data center load fluctuation problem will capture a significant market share.

64.     Atlas's confidential information derives independent economic value from not being generally known, and not being readily ascertainable by proper means, by any other person who can obtain economic value from its use or disclosure.

65.     Atlas undertakes reasonable and diligent measures to maintain the secrecy of the

Atlas Trade Secrets and its confidential information by, among other things: (1) limiting access to the confidential information to a select group of employees on a strict need to know basis; (2) storing the confidential information on encrypted hard drives and requiring multiple levels of password protection to maintain its secrecy and prevent unauthorized access or dissemination; (4) requiring employees, executives, and directors who have access to this confidential information to sign nondisclosure agreements; (5) utilizing confidential filesharing sites and programs with multiple layers of security for all research and development in connection with Atlas' Energy Storage Control System; and (6) terminating personnel's access to any confidential information upon conclusion of their association with Atlas and requiring them to return such information.

### C. Hinton Joins Atlas and Gains Access to the Atlas Trade Secrets

66. Hinton is a veteran of the power infrastructure and distributed energy industry, and founder of a company providing distributed power generation, utility infrastructure, and microgrid solutions.

67. Hinton became an early investor in Atlas in March 2021.

68. In connection with Hinton's investment in Atlas, Hinton executed a Non Disclosure Agreement dated March 24, 2021 (the "NDA"). A copy of the NDA is attached to the Declaration of Mitchell Miller (the "Miller Dec.") as Exhibit 2.

69. Contemporaneously with the NDA, Hinton signed a Subscription Agreement and Joinder to Shareholders' Agreement dated March 24, 2021 (the "Joinder Agreement"). A copy of the Joinder Agreement is attached to the Miller Dec. as Exhibit 1.

70. The Joinder Agreement also bound Hinton, as a shareholder, to comply with all amendments to the Atlas shareholders' agreement, including those set forth in the Amended and Restated Shareholders' Agreement dated October 11, 2022 (the "Shareholders' Agreement"). A

copy of the Shareholders' Agreement is attached to the Miller Dec. as Exhibit 3.

71.     The Shareholders' Agreement, like the NDA, set forth binding non-compete provisions in Section 11.2.1, and confidentiality and non-use provisions in Section 11.5, intended by Atlas to protect its confidential information and the Atlas Trade Secrets.

72.     The NDA contains reasonable confidentiality and non-disclosure clauses, as well as a non-compete clause that required Hinton, among other things, to hold Atlas's confidential information in the strictest confidence and not to use Atlas's confidential information or any business advantage derived therefrom for Hinton's own benefit or affairs.

73.     The NDA expressly prohibited Hinton from disclosing the Atlas Trade Secrets without Atlas's authorization.

74.     The NDA imposed upon Hinton, in addition to the duties he owed Atlas as a director including his fiduciary duties, a duty to maintain the secrecy of the Atlas Trade Secrets and affirmatively protect the Atlas Trade Secrets and any other confidential information from dissemination to third parties who could potentially usurp Atlas's business opportunities.

75.     Atlas further sought to protect its confidential information from misappropriation or misuse by providing in the NDA that in the event Hinton breached the NDA, Atlas would be entitled to equitable and/or injunctive relief from Hinton. *See* Ex. 2, ¶ 7.

76.     In 2022, Atlas's Executive Chairman recommended that Hinton become a director based upon Hinton's industry experience in the microgrid and electrical infrastructure industry.

77.     Hinton signed a Consent to Act as Director dated September 20, 2022 (the "Consent"). A copy of the Consent is attached to the Miller Dec. as Exhibit 4.

78.     As a director of Atlas, Hinton was provided with access to Atlas's highly confidential information and the Atlas Trade Secrets, including: (1) weekly technical brief

minutes from Atlas's internal technical meetings concerning all aspects of the business and in particular the Energy Storage Control System; (2) annual reports to the board of directors including detailed information about the breakthrough design, development, and progress of Atlas's Energy Storage Control System; and (3) board meetings where highly confidential information concerning the Energy Storage Control System and other Atlas Trade Secrets was discussed in detail.

79.     Hinton was privy to and consulted about the Atlas Trade Secrets, receiving real time access to such information and weekly updates containing highly confidential information throughout the Energy Storage Control System's development and deployment on the Atlas test microgrid. This information was provided to Hinton, a director and investor, ███████████████

████████████████████████████████████████████████████████

██████

80.     Atlas impressed upon Hinton and the other board members that the board reports were highly confidential, and the reports received by Hinton in 2024 and 2025 expressly stated on the first page, as well as the bottom of all subsequent pages, that the information he was receiving was "CONFIDENTIAL: DO NOT SHARE. ONLY FOR ATLAS MANAGEMENT AND DIRECTORS. CONTAINS EXTREMELY SENSITIVE INFORMATION[.]"

81.     This warning to Hinton and the other directors was crucial because the technical information set forth in the board reports outlined, in detail, every breakthrough that a competitor would need to replicate Atlas's Energy Storage Control System without the painstaking and costly years of research, development, and testing performed by Atlas that constituted the Atlas Trade Secrets.

82.     The November 2024 board report, for example, contained an extensive

breakdown of Atlas's prototype Energy Storage Control System components, including proprietary software, firmware, control structures, and architecture, including Atlas's generation 1 control system architecture, which lays the basis and groundwork for the generation 2 architecture.

83.     Then with this information for Atlas' generation 1 control system architecture in hand, Hinton continued to receive weekly meeting technical briefs that described Atlas's breakthrough for the Energy Storage Control System in 2025, which would be referred to as Atlas generation 2 control system; this included the minutes describing the breakthrough █████ ██████████████████████████████

84.     This proprietary breakthrough was particularly noteworthy, because no other company had developed technology that could ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████

85.     As a director of Atlas, Hinton was aware of Atlas's core business focus on this issue, and the technical advancements in the Energy Storage Control System and other Atlas Trade Secrets that were documented and stated in the confidential reports and weekly updates.

86.     Hinton received these reports in connection with his duties as an Atlas board member and acknowledged receiving them – and even reading them – via email.

87.     The technical progress outlined in these confidential reports and assessments demonstrated that the Atlas Trade Secrets had positioned Atlas to become the first company in the world to provide a real and sustainable solution to the load fluctuation problem encountered in AI data centers.

88.     As Hinton acquired the Atlas Trade Secrets, Hinton's technical interest in the Energy Storage Control System's confidential and proprietary technical details increased, culminating in an October 21, 2025 board meeting where Hinton probed Atlas's CTO – who was scheduled to give only a 15 minute presentation in the meeting – so deeply into the technical aspects of the Energy Storage Control System, and asked a series of such detailed questions ██████████████████████████████████████████, that the CTO's presentation went over by 10 minutes to 25 minutes. It is highly unusual for a director to probe a CTO so deeply with such highly technical questions in a board meeting and strongly suggests that Hinton was gathering as much information as he could to enable UIG to utilize Atlas's secret technology itself.

89.     Hinton acquired knowledge of and gained access to all of the Atlas Trade Secrets, that he was responsible for and duty-bound to safeguarding.

90.     The level of technical specificity and the depth of Hinton's questioning was particularly noteworthy to the board and Atlas executives, because it demonstrated a far more advanced understanding of the underlying Energy Storage Control System technology than Hinton had shown in prior discussions.

91.     As a result of Hinton's questions, Atlas's Chief Technology Officer devoted additional time to explaining the Energy Storage Control System's proprietary technical details to Hinton.

92.     Hinton stated that it would be "great" for him and his team of engineers from his UIG companies to visit Atlas' site where the Energy Storage Control System was being developed and tested.

93.     From the date Hinton became an investor through the present, upon information

and belief, Hinton never disclosed that his UIG companies were or would shortly become a direct competitor to Atlas; to the contrary, upon information and belief, he indicated that UIG's focus centered on battery-based systems for EV charging infrastructure.

94. UIG's purported EV battery-based business was very different from Atlas's AI data center system architecture and supercapacitor-based control structure devices.

95. If Hinton had disclosed that his UIG companies were in direct competition with Atlas, and developing a competing AI data center load fluctuation solution and thus racing against Atlas to be first to market, Atlas would not have provided him with the Atlas Trade Secrets and indeed would most likely have asked him to step down from the Board or – depending on when the disclosure was made – not invited him to join the Board at all.

**D. Atlas Discovers UIG is Launching an Identical "First to Market" Product**

96. On November 10, 2025, Atlas's CEO and CTO attended a call on behalf of Atlas ███████████████████████████████████

97. During the call, the Supplier-1 employee mentioned that Supplier-1 had developed a new "AI option" intended to address rapid load changes – the exact problem that Atlas had devoted years of research and design and millions of dollars to solve by creation of its proprietary Energy Storage Control System.

98. After this call, Atlas investigated and discovered a press release issued by UIG on October 16, 2025, stating that it had partnered with Supplier-1 and had developed a new product targeting AI data centers and fluctuating load supply issues. A copy of UIG's October 16, 2025 press release is attached to the Miller Dec. as Exhibit 14.

99. At this point in time, Atlas was unaware of any connection between UIG and Hinton, because Hinton's passing reference to UIG back in 2022 when he first joined Atlas's board made clear (so he said) that UIG focused on EV power stations and mentioned nothing

17

about it being involved in, or planning to move into, the AI data center space. Upon further digging into UIG, Atlas discovered that the company had been founded and was led by none other than Hinton, who had at no time informed Atlas's other Board members that UIG's focus had shifted to AI data centers.

100.     UIG described the new AI-related product as including a revised PCS configuration provided by Supplier-1, paired with control functionality provided by UIG.

101.     The press release indicated that UIG had developed a combined solution with Supplier-1 aimed at addressing exactly the same AI load-change challenges that Atlas had addressed with the Atlas Trade Secrets.

102.     Supplier-1 issued a similar press release, announcing that it would utilize the exact system architecture and control structure that Atlas had created using the Energy Storage Control System, and which Atlas had previously declined to provide to Supplier-1. A copy of Supplier-1's October 16, 2025 press release is attached to the Miller Dec. as Exhibit 13.

103.     During a follow-up call with Supplier-1 held on November 13, 2025, the Supplier-1 employee explained that UIG's new 'integrated energy management and controls ecosystem' was called "agile grid forming" and that it was designed to identify load fluctuations within milliseconds of the occurrence and then smooth out those fluctuations.

104.     Notably, the new Supplier-1 hardware that was combined with UIG's misappropriated new technology had only been announced in October 2025, indicating that UIG's purported "breakthrough" in solving load fluctuations and combining this new technology with Supplier-1's new hardware took place *months after* Atlas's own breakthrough with the Energy Storage Control System and subsequent proprietary refinements extensively detailed in the Atlas board report in November 2024 and Atlas's weekly technical updates and meeting

minutes provided to Hinton throughout 2025.

105.　　This UIG technology was virtually identical to Atlas's Energy Storage Control System, created using Atlas's Trade Secrets, which Hinton had been receiving confidential and proprietary technical information about for years, and had recently asked deeply probing technical questions about during the October 21, 2025 board meeting.

106.　　By October 16, 2025, Defendants were announcing an identical product to Atlas's Energy Storage Control System technology, that purportedly solved the load fluctuation problem for AI data centers in exactly the same way that Atlas's Energy Storage Control System did, in partnership with Atlas's primary hardware supplier with whom Atlas had already discussed partnering to create a new product in this area, to usurp Atlas's ability to enter the market as the first and only provider of this new technology.

107.　　Put another way, by 2025 only two (2) companies in the entire world had created products capable of solving the global AI data center load fluctuation problem – UIG and Atlas – and it is not a coincidence that the companies have the same director, Hinton.

108.　　Even more egregiously, UIG's product, its new 'integrated energy management and controls ecosystem' that Supplier-1 described as "agile grid forming" technology, was only publicly announced in October 2025, ***almost a year*** after Hinton obtained Atlas Trade Secrets including the pivotal breakthroughs set forth in Atlas's weekly technical briefs and the technical updates Hinton received throughout 2025, ████████████████████████████████

████████████████████████████████████████████████

████████████

109.　　It was clear that Hinton had misused Atlas's confidential information and the Atlas Trade Secrets he had received in connection with his role as an Atlas director for years, and

had misappropriated Atlas's Trade Secrets to his UIG companies, to attempt to corner the AI data center market before Atlas and completely usurp Atlas's substantial business opportunity.

**E. Defendants' Misappropriation Threatens to Destroy Atlas's Business**

110. Defendants' misappropriation of Atlas's confidential information and the Atlas Trade Secrets threatens to destroy Atlas's business by: (1) exposing the Atlas Trade Secrets, including the Energy Storage Control System's highly confidential internal structural architecture and control systems, allowing reverse-engineering by sophisticated industry actors; (2) undermining pending and future PCT applications that rely upon the confidentiality of the Atlas Trade Secrets; (3) barring Atlas from asserting novelty or non-obviousness to protect Atlas' proprietary interest in any future patent; (4) eliminating Atlas's market advantage as the "first to market" this unique solution to the AI data center load fluctuation problem; (5) damaging Atlas's ability to raise funds and secure investors; (6) harming Atlas's reputation in the industry, leading to negative impacts on investor confidence, partner relationships, future fundraising ability, talent recruitment, and long-term strategic positioning.

111. Atlas has reason to believe that UIG has already filed, or will shortly seek to file, patent applications under the PCT Treaty or national laws regarding the new 'integrated energy management and controls ecosystem' it called an "agile grid forming" system based upon the Atlas Trade Secrets, which would jeopardize Atlas's ability to secure and protect its own patents in Canada and the United States.

112. The foregoing has been the direct result of the misappropriation of Atlas's Energy Storage Control System by Hinton and UIG and is certain to cause Atlas irreparable harm.

113. Atlas must now seek urgent injunctive relief because UIG is, upon information and belief, on the verge of deploying its new product utilizing the misappropriated Atlas Trade Secrets taken by Hinton, creating the imminent risk of irreparable harm from UIG's public

exposure of the Atlas Trade Secrets, as well as Atlas's loss of the "first to market" advantage that UIG intends to capture in the AI data center market from Atlas.

**COUNT I - The Defend Trade Secrets Act**
**(18 U.S.C. § 1831 *et seq.*)**
***Atlas v. Defendants***

114.     Atlas repeats and realleges the allegations set forth in paragraphs 1 through 113 above, as if fully set forth herein.

115.     The Defend Trade Secrets Act ("DTSA") prohibits the misappropriation of trade secrets.

116.     Atlas has developed and owns valuable trade secrets related to its products and services that are used in, or intended for use in, interstate and foreign commerce. These are the Atlas Trade Secrets defined above.

117.     The Atlas Trade Secrets are not generally known to the public, are not readily ascertainable, and derive value to Atlas from this secrecy.

118.     The Atlas Trade Secrets include its financial, business, scientific, technical, economic and engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, and codes, both tangible and intangible, and stored, compiled, and memorialized physically, electronically, graphically, and photographically, including:

a)      the Energy Storage Control System, including its algorithms, methodologies, software, firmware, system architecture, and control structures;

b)      ███████████████████████████████████████
         ███████████████████████████████████████
         ██████████

c) ███████████████████████████████████████████████████

███████████████████████████████████████

d) Atlas's other confidential business information, including strategic and tactical business plans for using the Energy Storage Control System, ████████████ ███████████████████████████████████, data derived from marketing projects and initiatives, research and development activities, pricing structure and strategies, financial results and forecasts, and investor, customer, prospect, and supplier lists and data, including valuable business relationships with companies and individuals developing major AI data center projects.

119.     The Atlas Trade Secrets and other confidential information acquired and developed by Atlas derives independent economic value, actual or potential, from the fact that it is neither generally known to the public, nor readily ascertainable by the public through proper means. Through Atlas's substantial investment of time, effort, and expense in developing its confidential information, it is able to operate and grow its business in a way that is difficult, if not impossible, for its competitors to duplicate through lawful means.

120.     Atlas has taken reasonable measures to keep the Atlas Trade Secrets secret, including by implementing policies requiring individuals with access to the confidential information to keep it secret, limiting access to the confidential information to key employees with a strict need to know, securing the confidential information with the use of passwords, key cards, encryption, and other security measures, utilizing a filesharing and development site with multiple layers of security, terminating personnel's access to the confidential information upon

conclusion of employment and requiring the return of such information, and requiring personnel with access to the confidential information to execute non-disclosure agreements.

121. Upon information and belief, Hinton disclosed the Atlas Trade Secrets and Atlas's confidential information through improper means and without Atlas's authorization or consent. Moreover, Hinton's and UIG's misappropriation of the confidential information was willful and malicious.

122. Upon information and belief, Hinton's misappropriation of the Atlas Trade Secrets took place in North Carolina, where Hinton resides, received the Atlas Trade Secrets, and attended Atlas board meetings virtually.

123. As the director, officer, and/or manager of UIG, Hinton's willful and malicious intent in misappropriating the Atlas Trade Secrets must be imputed to UIG, which is comprised of companies created and controlled by Hinton.

124. Upon information and belief, Hinton also acted as an agent of UIG to commit the misappropriation of the Atlas Trade Secrets.

125. Upon information and belief, Hinton acted within the scope of his authority at UIG in misappropriating the Atlas Trade Secrets.

126. Upon information and belief, Hinton misappropriated the Atlas Trade Secrets with an intent to benefit UIG.

127. UIG received a benefit from Hinton's misappropriation of the Atlas Trade Secrets that allowed UIG to create its new 'integrated energy management and controls ecosystem' also referred to as the "agile grid forming" technology based upon Atlas's Energy Storage Control System and other Atlas Trade Secrets that it is now marketing with Atlas's principal supplier.

128. Upon information and belief, Hinton's UIG companies integrated the

misappropriated Atlas Trade Secrets at their Raleigh global headquarters.

129.    Hinton was well aware that he was bound to protect the Atlas Trade Secrets by, among other things, his fiduciary duties and the express terms of the NDA and the shareholder agreement not to share or utilize Atlas's confidential material that he received for years.

130.    Hinton also intentionally and maliciously failed to disclose that, after receiving years of proprietary confidential information and the Atlas Trade Secrets, his own UIG companies improperly released a first-to-market 'integrated energy management and controls ecosystem' called "agile grid forming"  technology in partnership with Atlas's primary supplier that solved the AI data center load fluctuation problem in the exact same manner as the Energy Storage Control System, immediately after Atlas had solved this problem and detailed this breakthrough in highly confidential technical updates provided to Hinton.

131.    Atlas has never consented, and does not consent, expressly or implicitly, to the use or disclosure by Hinton or UIG of Atlas's confidential information and the Atlas Trade Secrets and expressly bound Hinton not to do so in the NDA, among other agreements.

132.    Hinton has disclosed the Atlas Trade Secrets and Atlas's confidential information in violation of his obligations to maintain the secrecy of this information.

133.    Indeed, despite repeatedly being reminded of his obligation to maintain the secrecy of the confidential information, Hinton has delivered the confidential information to Supplier-1, an unauthorized third party, and upon information and belief is on the verge of releasing the new 'integrated energy management and controls ecosystem' called "agile grid forming" technology created using Atlas's Energy Storage Control System technology for public use.

134.    In fact, UIG and Supplier-1 have both issued press releases marketing their

products.

135.    The DTSA allows for the following relief: (1) an award of damages for the actual loss caused by the misappropriation of the trade secrets and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss, (18 U.S.C. § 1836(3)(B); (2)) an award of exemplary damages for willful and malicious misappropriation of trade secrets, (18 U.S.C. § 1836(3)(C)); and (3) injunctive relief to prevent any actual or threatened misappropriation of trade secrets, (18 U.S.C. § 1836(3)(A)).

136.    Injunctive relief is now necessary to stop Defendants from releasing their new "integrated energy management and controls ecosystem," also called "agile grid forming" technology containing the Atlas Trade Secrets into the market this year, which UIG and Atlas's supplier have announced in their October press releases they intend to begin shipping in 2025.

137.    Atlas is being, and will be, harmed through the misappropriation of its confidential information. The exact amount of the harm will be difficult, if not impossible, to ascertain, but includes the loss of business and the diminution of value of the confidential information.

138.    Specifically, and among other things, Atlas will lose its "first mover" advantage that the Atlas Trade Secrets have created. The first company to launch a product solving the AI data center power fluctuation problem will capture the market and position itself to lock in this advantage permanently. Defendants will also destroy Atlas's ability to further develop its technology in secret and ability to seek patents based upon the novelty of the Atlas Trade Secrets.  In addition, Defendants' imminent product launch will destroy Atlas's technical leadership in this area, harm existing business relationships with data center owners and developers based upon Atlas's advancements, and investor confidence. This harm is likely to be

irreparable. Further, the harm Atlas will suffer if Hinton and UIG are not enjoined greatly outweighs any harm Hinton and UIG would suffer from the issuance of injunctive relief.

WHEREFORE, Atlas respectfully requests the Court enter an order granting it all appropriate relief against defendants Hinton and UIG, including:

(A)   A preliminary and permanent injunction: (1) prohibiting Hinton and UIG, and all those acting in concert with them, from using or disclosing to any person Atlas's confidential information and from continuing to be in breach of the NDA and prohibiting Hinton from continuing to be in breach of his fiduciary duties, (2) ordering Hinton and UIG to immediately preserve and return to Atlas the Atlas Trade Secrets and all of Atlas's confidential information, and all copies thereof, regardless of the format in which such copies are stored or maintained; (3) prohibiting commercialization, sale, or deployment of any control system utilizing the Atlas Trade Secrets, including without limitation UIG's new "integrated energy management and controls ecosystem," also called UIG's "agile grid forming" technology; (4) requiring Defendants to provide an accounting of all products, materials, documents, and data obtained from Atlas; (5) prohibiting Defendants from utilizing the Atlas Trade Secrets in furtherance of Defendants' business or in any other manner; (6) requiring Defendants to pay for and deliver to a third party forensic vendor all email accounts, data storage accounts, servers, systems and devices used by Hinton and/or the recipient of any Atlas Trade Secrets transmitted by Hinton, and any additional device or system that was used to disseminate or access Atlas's confidential information and the Atlas Trade Secrets or on which Atlas's confidential information and the Atlas Trade Secrets

were found, to ensure that any and all confidential information and the Atlas Trade Secrets are retrieved and permanently removed; (7) prohibiting Defendants from (i) misappropriating, using or disclosing to any person or entity the Atlas Trade Secrets and/or Atlas's confidential information, and (ii) possessing any original, copies or summaries of Atlas's confidential information and the Atlas Trade Secrets in any form, electronic or otherwise;

(B) Disgorging UGI of profits obtained as a result of Defendants' misuse of Atlas's confidential information and the Atlas Trade Secrets.

(C) Requiring Defendants to provide quarterly affidavits for a period of two (2) years verifying that they have complied with their obligations to Atlas under the Order.

(D) An award of Atlas's actual damages for the misappropriation of its confidential information and the Atlas Trade Secrets.

(E) An award of exemplary damages for Hinton and UIG's willful and malicious misappropriation of Atlas's confidential information and the Atlas Trade Secrets.

(F) Such other and further relief as the Court deems just and proper, including without limitation an award of Atlas's costs and reasonable attorney's fees.

### COUNT II - The North Carolina Trade Secrets Protection Act
### (N.C. Gen. Stat. §§ 66-152 *et seq.*)
### *Atlas v. Defendants*

139. Atlas repeats and realleges the allegations set forth in paragraphs 1 through 138 above, as if fully set forth herein.

140. Atlas owns and possesses substantial confidential and trade secret information that it utilizes in its business, as alleged above. These Atlas Trade Secrets, as described above, derive independent economic value from not being generally known or readily ascertainable by

those who could obtain economic value from their disclosure or use. This information constitutes "trade secrets" under the North Carolina Trade Secrets Protection Act ("TSPA"), N.C. Gen. Stat. § 66-152 *et seq.*

141. Atlas derives significant economic value from the Atlas Trade Secrets not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the information.

142. Atlas has taken reasonable efforts to maintain the secrecy of its confidential information and the Atlas Trade Secrets, including, without limitation, maintaining the Atlas Trade Secrets behind a password-protected computer system and marking many of its trade secret documents as confidential. Atlas also has policies prohibiting the transmittal or disclosure of the Atlas Trade Secrets outside of a narrow group of Atlas directors, executives, and employees, restrictions on the use of personal email for business, limitations on visitor access, termination of access upon termination of employment, among other efforts: (1) limiting access to the Atlas Trade Secrets and other confidential information to a select group of employees who have a strict need to know; (2) storing the confidential information on encrypted hard drives and requiring multiple levels of password protection to maintain its secrecy and prevent unauthorized access or dissemination; (4) requiring employees, executives, and directors such as Hinton who have access to the Atlas Trade Secrets and Atlas's confidential information to sign nondisclosure agreements such as the NDA; (5) utilizing confidential filesharing sites and programs with multiple layers of security for all research and development in connection with the Atlas Trade Secrets; and (6) terminating personnel's access to the Atlas Trade Secrets and any confidential information upon conclusion of their association with Atlas and requiring them to return such information.

143. The Atlas Trade Secrets include, *inter alia*, Atlas's confidential information identified above, all of which provide Atlas with unique technological and business advantages over its competitors.

144. In connection with his position as a director and investor with Atlas, Hinton had access to, and knowledge of, the Atlas Trade Secrets.

145. At all relevant times herein, Hinton had a duty to maintain the secrecy of the Atlas Trade Secrets and Atlas's confidential information, and to not use any of this information for any purpose other than in connection with the performance of his duties to Atlas.

146. Despite those obligations, Hinton, upon information and belief, has knowingly misappropriated, used, and disclosed the Atlas Trade Secrets for his own personal gain and for the benefit of his UIG companies, which Hinton either concealed or materially omitted to disclose are in direct competition with Atlas.

147. Hinton gained access to Atlas's confidential information and the Atlas Trade Secrets through several ways, including: (1) receiving weekly technical briefing minutes from Atlas's team development meetings concerning the Energy Storage Control System; (2) receiving annual reports to the board of directors including detailed technical information about the design, development, and progress of the Energy Storage Control System; and (3) attending and participating in board meetings where highly confidential information concerning the Energy Storage Control System was discussed in detail. Hinton and UIG continue to possess and utilize the Atlas Trade Secrets without Atlas's consent, in violation of TSPA.

148. Atlas has not consented, expressly or by implication, to Hinton's or UIG's continued possession or use of Atlas's confidential information and the Atlas Trade Secrets.

149. Unless enjoined by this Court, Hinton's and UIG's misappropriation of the Atlas Trade Secrets will cause significant irreparable harm to Atlas, and Atlas has no adequate or other remedy at law for such threatened acts.

150. Irreparable harm is presumed when trade secrets, such as the Atlas Trade Secrets, have been misappropriated. As such, Atlas is entitled to a temporary restraining order and preliminary and permanent injunctive relief.

151. As a direct, proximate, and foreseeable result of Defendants' misappropriation of the Atlas Trade Secrets, Atlas has been damaged in an amount to be determined at trial.

152. Hinton's and UIG's actions were and are willful and malicious, thus justifying an award of exemplary damages and attorney's fees.

153. As the director and/or manager of UIG, Hinton's willful and malicious intent in misappropriating the Atlas Trade Secrets must be imputed to UIG, which is comprised of companies created and controlled by Hinton.

154. Upon information and belief, Hinton also acted as an agent of UIG to commit the misappropriation of the Atlas Trade Secrets.

155. Upon information and belief, Hinton acted within the scope of his authority at UIG in misappropriating the Atlas Trade Secrets.

156. Upon information and belief, Hinton misappropriated the Atlas Trade Secrets with an intent to benefit UIG.

157. UIG received a benefit from Hinton's misappropriation of the Atlas Trade Secrets, that allowed UIG to create a new "integrated energy management and controls ecosystem" that was described as "agile grid forming" technology based upon Atlas's Energy Storage Control System and other Atlas Trade Secrets that it is now marketing with Atlas's

principal supplier.

WHEREFORE, Atlas respectfully requests the Court enter an order granting it all appropriate relief against defendants Hinton and UIG, including:

(A)    A preliminary and permanent injunction: (1) prohibiting Hinton and UIG, and all those acting in concert with them, from using or disclosing to any person Atlas's confidential information and from continuing to be in breach of the NDA and prohibiting Hinton from continuing to be in breach of his fiduciary duties, (2) ordering Hinton and UIG to immediately preserve and return to Atlas the Atlas Trade Secrets and all of Atlas's confidential information, and all copies thereof, regardless of the format in which such copies are stored or maintained; (3) prohibiting commercialization, sale, or deployment of any control system utilizing the Atlas Trade Secrets, including without limitation UIG's new "integrated energy management and controls ecosystem," described as "agile grid forming" technology; (4) requiring Defendants to provide an accounting of all products, materials, documents, and data obtained from Atlas; (5) prohibiting Defendants from utilizing the Atlas Trade Secrets in furtherance of Defendants' business or in any other manner; (6) requiring Defendants to pay for and deliver to a third party forensic vendor all email accounts, data storage accounts, servers, systems and devices used by Hinton and/or the recipient of any Atlas Trade Secrets transmitted by Hinton, and any additional device or system that was used to disseminate or access Atlas's confidential information and the Atlas Trade Secrets or on which Atlas's confidential information and the Atlas Trade Secrets were found, to ensure that any and all confidential information and the Atlas Trade Secrets are retrieved

and permanently removed; (7) prohibiting Defendants from (i) misappropriating, using or disclosing to any person or entity the Atlas Trade Secrets and/or Atlas's confidential information, and (ii) possessing any original, copies or summaries of Atlas's confidential information and the Atlas Trade Secrets in any form, electronic or otherwise;

(B)     Disgorging UGI of profits obtained as a result of Defendants' misuse of Atlas's confidential information and the Atlas Trade Secrets.

(C)     Requiring Defendants to provide quarterly affidavits for a period of two (2) years verifying that they have complied with their obligations to Atlas under the Order.

(D)     An award of Atlas's actual damages for the misappropriation of its confidential information and the Atlas Trade Secrets.

(E)     An award of exemplary damages for Hinton and UIG's willful and malicious misappropriation of Atlas's confidential information and the Atlas Trade Secrets.

(F)     Such other and further relief as the Court deems just and proper, including without limitation an award of Atlas's costs and reasonable attorney's fees.

### COUNT III – Breach of Fiduciary Duty Under British Columbia Law
### (British Columbia Business Corporations Act § 142 *et seq.*)
### *Atlas v. Hinton*

158.    Atlas repeats and realleges the allegations set forth in paragraphs 1 through 157 above, as if fully set forth herein.

159.    Hinton's duties as a director of Atlas are set forth in, *inter alia*, the British Columbia Business Corporations Act ("BCBCA"), BCBCA § 142 *et seq*.

160.    Under British Columbia statutory and common law, Hinton is a director of Atlas and thus owes Atlas fiduciary duties of care and loyalty, including a duty not to appropriate

corporate opportunities from Atlas.

161. Hinton expressly accepted these duties and obligations when he signed the Consent.

162. By virtue of Hinton's role as a director of Atlas, Hinton owed specific duties to Atlas including duties of loyalty, honesty, good faith, confidence, disclosure of material facts and conflicts of interest, and the exercise of reasonable prudence, care, and skill.

163. Upon information and belief, Hinton failed to disclose to Atlas that his UIG companies were not (or were no longer) primarily focused upon battery-based systems for EV charging infrastructure but rather were in direct competition with Atlas's AI data center system architecture and supercapacitor-based control structure devices such as the Energy Storage Control System.

164. Hinton breached each of his fiduciary duties by, among other things, misappropriating and transferring Atlas's confidential information and the Atlas Trade Secrets to Hinton's other companies, UIG.

165. Hinton further breached those duties by causing UIG to create and market UIG's competing new "integrated energy management and controls ecosystem," also described as "agile grid forming" technology, in direct competition with Atlas's Energy Storage Control System technology and based upon the Atlas Trade Secrets.

166. If not enjoined, Hinton's breaches will allow UIG to achieve a "first to market" solution for AI data center load fluctuation problems before the end of the year, capturing this nascent market, and thereby destroying Atlas's business relationships with AI data center developers and pending opportunities to integrate Atlas's Energy Storage Control System into new AI data center developments.

167.    Hinton's actions will also harm Atlas's ability to secure additional investors and raise necessary funding, which, as a director, Hinton knows is vital to Atlas's continued operation.

168.    Upon information and belief, Hinton intentionally promoted his own financial interests, both personal and direct, and his interests as a director and/or officer of UIG, to directly conflict with those of Atlas, and otherwise acted contrary to Atlas's interests in order to usurp Atlas's extraordinarily valuable corporate opportunity.

169.    Atlas has engaged in discussions with Supplier-1 about partnering with Supplier-1 to develop exactly the same type of product Defendants have threatened to launch.

170.    If not enjoined, Hinton's actions and omissions will damage Atlas's business by: (1) publicly exposing the Atlas Trade Secrets, including the Energy Storage Control System's confidential and proprietary structural architecture and control systems, allowing reverse-engineering by sophisticated industry actors; (2) undermining pending and future PCT applications that rely upon the confidentiality of the Atlas Trade Secrets; (3) barring Atlas from asserting novelty or non-obviousness to protect Atlas' proprietary interest in any future inventions; (4) eliminating Atlas's market advantage as the "first to market" this unique solution to the AI data center load fluctuation problem; (5) damaging Atlas's ability to raise funds and secure investors; (6) harming Atlas's reputation in the industry, leading to negative impacts on investor confidence, partner relationships, future fundraising ability, talent recruitment, and long-term strategic positioning. Such harm will be highly difficult, if not impossible, to measure in monetary damages, indicating that immediate injunctive relief is warranted.

WHEREFORE, Atlas respectfully requests the Court enter judgment in favor of Atlas and against Defendants, granting all appropriate relief, including all equitable remedies,

including a temporary restraining order and preliminary injunctive relief, as well as actual damages, punitive damages and attorney's fees, and any other relief this Court deems fair and just.

## PRAYER FOR RELIEF

WHEREFORE, Atlas respectfully prays the Court:

a. For a judgment in its favor and against Defendants on all claims herein;

b. For an award of damages in an amount to be determined by the trier of fact, together with pre- and post-judgment interest thereon at the maximum legal rate;

c. For injunctive relief in the form of an order:

   i. prohibiting Hinton and UIG, and all those acting in concert with them, from using or disclosing to any person Atlas's confidential information and from continuing to be in breach of the NDA and prohibiting Hinton from continuing to be in breach of his fiduciary duties,

   ii. ordering Hinton and UIG to immediately preserve and return to Atlas the Atlas Trade Secrets and all of Atlas's confidential information, and all copies thereof, regardless of the format in which such copies are stored or maintained;

   iii. prohibiting commercialization, sale, or deployment of any control system utilizing the Atlas Trade Secrets, including without limitation UIG's new "integrated energy management and controls ecosystem," also described as "agile grid forming";

   iv. requiring Defendants to provide an accounting of all products, materials, documents, and data obtained from Atlas;

   v. prohibiting Defendants from utilizing the Atlas Trade Secrets in furtherance of Defendants' business or in any other manner;

   vi. requiring Defendants to pay for and deliver to a third party forensic vendor

36

all email accounts, data storage accounts, servers, systems and devices used by Hinton and/or the recipient of any Atlas Trade Secrets transmitted by Hinton, and any additional device or system that was used to disseminate or access Atlas's confidential information and the Atlas Trade Secrets or on which Atlas's confidential information and the Atlas Trade Secrets were found, to ensure that any and all confidential information and the Atlas Trade Secrets are retrieved and permanently removed;

vii. prohibiting Defendants from (i) misappropriating, using or disclosing to any person or entity the Atlas Trade Secrets and/or Atlas's confidential information, and (ii) possessing any original, copies or summaries of Atlas's confidential information and the Atlas Trade Secrets in any form, electronic or otherwise;

viii. disgorging UGI of profits obtained as a result of Defendants' misuse of Atlas's confidential information and the Atlas Trade Secrets.

ix. requiring Defendants to provide quarterly affidavits for a period of two (2) years verifying that they have complied with their obligations to Atlas under the Order.

d. For an award of exemplary damages for Hinton and UIG's willful and malicious misappropriation of Atlas's confidential information and the Atlas Trade Secrets;

e. For an award of Atlas's reasonable costs, expenses and legal fees incurred in this action as allowed by statute;

f. For a trial by jury on all issues so triable; and

g. For such other and further relief as the Court may deem just and proper.

37

Dated: December 2, 2025          Respectfully submitted,

**BLANK ROME LLP**

/s/ Caroline P. Donelan
Caroline P. Donelan
(Bar No. 37002)
2029 Century Park East
Los Angeles, CA 90067
Phone: (424) 239-3400
Fax: (212) 885-5001
Email: caroline.donelan@blankrome.com

/s/ Bradley L. Henry
Bradley L. Henry (*notice of special appearance pending*)
Lisa M. Coyle (*notice of special appearance pending*)
1271 Avenue of the Americas
New York, NY 10020
Phone: (212) 885-5000
Fax: (212) 885-5001
Email: bradley.henry@blankrome.com
          lisa.coyle@blankrome.com

**MCGUIREWOODS LLP**

/s/ Jodie Herrmann Lawson
Jodie Herrmann Lawson
(Bar No. 42900)
201 N. Tryon St., Suite 3000
Charlotte, NC 28202-2146
Phone: (704) 343-2329
Fax: (212) 885-5001
Email:jlawson@mcguirewoods.com

38

/s/ H. Brent McKnight Jr.
H. Brent McKnight, Jr.
(N.C. Bar No. 58000)
501 Fayetteville St., Suite 500
Raleigh, NC 27601
Phone: (919) 755-6693
Fax: (919) 755-6583
Email: bmcknight@mcguirewoods.com

*Local Civil Rule 83.1(d) Attorneys for
Plaintiff Atlas Power Technologies, Inc.*

## **VERIFICATION**

I, Mitchell Miller, Atlas's President, do hereby certify under penalty of perjury that the facts contained in this foregoing Verified Complaint are true and correct to the best of my personal knowledge, information, and belief. As to matters stated to be alleged on information and belief, I believe those matters to be true.

Dated: December 1, 2025

By: _Mitchell Miller_
    BC62A3B7A359467...
    Mitchell Miller

Mission, BC
Canada