IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:25-CV-00783-M

| | |
|---|---|
| ATLAS POWER TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> SIDNEY W. HINTON; UTILITY INNOVATION HOLDINGS, INC.; UTILITY INNOVATION GROUP, LLC; and GRIDSURE, LLC; <br><br> Defendants. | ORDER |

This matter comes before the court on Plaintiff's Motion for Temporary Restraining Order. DE 5. For the reasons explained and subject to the limitations detailed below, the motion is GRANTED IN PART and DENIED IN PART.

To obtain a temporary restraining order (TRO), the movant must show "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Additionally, to obtain an *ex parte* TRO, the movant must comply with the requirements laid out in Rule 65(b) of the Federal Rules of Civil Procedure.

First, although this court offers no opinion regarding the ultimate merits of Plaintiff's action, at this stage, Plaintiff has made a prima facie case under the Defend Trade Secrets Act (DTSA) based on the facts stated in the verified complaint and relevant attachments. In other words, the facts alleged in the complaint, if true, create a sufficient likelihood of success to warrant

a TRO pending a hearing from the parties concerning the sought-after preliminary injunction. "Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief." *McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995). Accordingly, the court sees no reason to address the merits of Plaintiff's claims under North Carolina and British Columbia law.

Under the DTSA, "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to . . . interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Trade secret "means all forms and types of . . . business, scientific, technical, . . . or engineering information, including . . . plans, . . . designs, . . . methods, techniques, [or] processes" so long as "the owner thereof has taken reasonable measures to keep such information secret," and "the information derives independent economic value" from its secrecy. 18 U.S.C. § 1839(3). The statute provides two definitions for the term "misappropriation:"

> (1) the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;" and
>
> (2) the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret."

18 U.S.C. § 1839(5).

Here, Plaintiff has introduced sufficient evidence for the court to conclude Plaintiff is likely to succeed in establishing that the relevant information is a trade secret. To protect Plaintiff's interest in an alleged trade secret and Defendants' interest in an innovative technology on the verge of being brought to market, for now, it will suffice to say that Plaintiff developed, in secret, what it believed to be a "first of its kind" technology to address the problems posed by the "unresolved

2

fluctuations in AI data center power systems." DE 9 ¶ 17. On its face, such a technology certainly meets the statute's definition of a trade secret; it is "information" that Plaintiff "has taken reasonable measures to keep . . . secret," and which appears to "derive[] independent economic value" from its secrecy. *See* 18 U.S.C. § 1839(3).

Plaintiff has, likewise, introduced sufficient evidence for the court to conclude Plaintiff is likely to establish that Defendants misappropriated trade secrets. Plaintiff developed the relevant technology in secret. In the development of this technology, Plaintiff contracted with Supplier-1, a manufacturer of power conversion systems to which Plaintiff attached its own technology. Supplier-1 expressed interest in developing a joint product—combining its conversion system and Plaintiff's power solution into one product. Plaintiff declined that request, instead choosing to value the privacy of its own development process and keep its power solution separate from Supplier-1's conversion systems. Defendant Hinton sat on Plaintiff's board of directors, during which he received detailed technological reports and apparently knew of Supplier-1's interest in developing a joint product. Defendant UIG, a corporation led and founded by Defendant Hinton, is on the verge of bringing to market, in collaboration with Supplier-1, the exact product Plaintiff seeks to bring to the market, also using Supplier-1's conversion system. Plaintiff contends that the power solution, Defendant UIG's contribution to the joint product, is identical to Plaintiff's power solution.

At this stage of the proceeding, the simpler answer is often the best. Here, Defendant Hinton sat on Plaintiff's board of directors—a position from which he learned both the specifics of Plaintiff's secret technology and of Supplier-1's interest in a joint product. Now, Defendant UIG, a corporation Defendant Hinton founded and for which he serves as CEO, plans to bring to market a joint product based on technology supposedly identical to Plaintiff's. There may be many

3

explanations for these events, but the simplest is clear: Defendant Hinton misappropriated Plaintiff's trade secrets to develop and bring to market innovative technology. This possibility is sufficiently likely to justify a TRO while the parties have the opportunity to argue, in greater detail, whether further injunctive relief is appropriate.

Plaintiff has also demonstrated that the alleged trade secret "is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). First, Plaintiff developed the technology in British Columbia, Canada, contracted with a supplier in California, and planned to sell its product across the United States. Accordingly, the interstate commerce element is satisfied.

Second, Plaintiff will likely suffer irreparable harm in the absence of injunctive relief. Irreparable harm is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1992) (citation omitted). "[H]arm is not 'irreparable' if it can be compensated by money damages." *Person v. Mayor & City Council of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006) (citing *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994)). But "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable harm injury prong is satisfied." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7. "A trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984). Thus, "[c]ourts have recognized that the potential for the loss of trade secrets . . . demonstrates irreparable harm." *Teksystems, Inc. v. Spotswood*, 2005 WL 8174397, at *5 (D. Md. June 29, 2005). Because, taking the facts alleged in the complaint as true, the court sees a sufficient risk that Defendants have misappropriated trade

4

secrets, Plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.

Third, given the above explanation, the balance of equities favors a TRO. In weighing the equities, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. As explained above, Plaintiff "faces the prospect of suffering irreparable harm through the continued disclosure of its trade secrets." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 141 (D. Md. 2020). And "the continued use of a purloined trade secret is a harm of significant measure that warrants injunctive relief." *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 708 (E.D. Va. 2012) (*overruled on other grounds*, 564 F. App'x 710, 712-13 (4th Cir. 2014) (remanding for a new trial due to an erroneous ruling on a pretrial motion in limine). On the other hand, Defendants likely will not suffer irreparable harm if the court grants a TRO. The TRO may force Defendants to briefly delay their plans to bring this new technology to market, but, as Plaintiffs argue, Defendants "will not be prevented from serving customers of its other [] products while a restraining order . . . remain[s] pending." DE 25. As such, the balance of equities favor granting the TRO.

Fourth, the public interest favors the granting of temporary injunctive relief. In determining whether the "injunction is in the public interest," *Winter*, 555 U.S. at 20, the court must recognize that the public interest "balances free competition in the marketplace with the warrant for monopoly protection of a trade secret, if one be found." *Direx Israel, Ltd.*, 952 F.2d at 814. It is "in the public's interest to validate . . . the proprietary nature of trade secrets," *NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 404 (D. Md. 2007), and "[w]hile the public certainly has an interest in promoting free market competition in a capitalist economy,

5

that interest is not protected unless the legal system prevents unethical business behavior." *Brightview Grp., LP*, 441 F. Supp. 3d at 142 (cleaned up).

Finally, Plaintiff has complied with the requirements of Rule 65(b) of the Federal Rules of Civil Procedure. As detailed above, taken as true, the "specific facts in [Plaintiff's] affidavit [and] verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Plaintiff's attorney has "certifie[d] in writing," Fed. R. Civ. P. 65(b)(1)(B), that Defendant Hinton "has been notified of this motion through email to the email address he used to conduct business with [Plaintiff], as well as FedEx to his home in Raleigh," that Defendants "UIGLLC, GridSure, and UIHI have been notified by virtue of notice to [Defendant] Hinton, email to its general office address, and FedEx to their Raleigh office," and Plaintiff's attorney intends "to personally serve [Defendants] Hinton and UIG over the next several days," DE 8 at 27.

Accordingly, the Motion is GRANTED IN PART. The court HOLDS IN ABEYANCE the portion of Plaintiff's motion requesting a preliminary injunction. Plaintiff's Motion for Hearing by Teleconference, DE 14, is DENIED AS MOOT. It is further ORDERED that:

(1) Utility Innovations Holding, Inc. ("UIHI"), Utility Innovation Group, LLC ("UIGLLC"), GridSure, LLC ("GridSure" and, collectively with UIHI and UIGLLC, "UIG"), Hinton, and all those acting in concert with them, are prohibited from using or disclosing to any person Atlas's confidential information;

(2) Hinton and UIG shall immediately preserve and return to Atlas the Atlas Trade Secrets and all of Atlas's confidential information, and all copies thereof, regardless of the format in which such copies are stored or maintained;

(3) Neither Hinton nor UIG shall commercialize, sell, or deploy any control system utilizing the Atlas Trade Secrets, including without limitation UIG's new

6

"integrated energy management and controls ecosystem," also described as "agile grid forming;"[1]

(4) Neither Hinton nor UIG shall utilize the Atlas Trade Secrets in furtherance of their business or in any other manner;

(5) Neither Hinton nor UIG shall (i) misappropriate, use, or disclose to any person or entity the Atlas Trade Secrets and/or Atlas's confidential information, or (ii) possess any original, copies or summaries of Atlas's confidential information and the Atlas Trade Secrets in any form, electronic or otherwise.

It is further ORDERED that this temporary restraining order shall go into effect today, December 3, 2025, at 2:00 P.M., and remain in full force and effect for fourteen (14) days from the date of the entry of this order or until the court orders otherwise, whichever is earlier. The court further notes that it specifically DENIES Plaintiff's motion with respect to the fifth condition of the proposed order, DE 5-1 at 2, ¶ 5; the court will not require that condition as part of a temporary restraining order.

Rule 65 further requires the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "In trade secret misappropriation cases, courts often set bond between $100,000 and $200,000." *M Corp v. Infinitive, Inc.*, 2024 WL 4696132, at *9 (E.D. Va. Nov. 6, 2024) (collecting cases). In this matter, a bond in the amount of one hundred thousand dollars ($100,000) is proper. Plaintiff is ORDERED to post a $100,000 bond. This amount will appropriately account for any harm that could come to Defendants due to the TRO.

Additionally, Plaintiff's Motion to Seal, DE 10, is GRANTED. Plaintiff seeks to restrict from public access the unredacted verified complaint, the unredacted memorandum in support of Plaintiff's Motion for TRO and Preliminary Injunction, and the unredacted copy of the declaration

---

[1] This order specifically enjoins for fourteen (14) days the commercialization of the product described in Plaintiff's sealed exhibits 13 and 14, DE 9-13, 9-14.

7

of Mitchell Miller and its attached exhibits. Pursuant to Local Civil Rule 79.2 and consistent with the requirements set forth in *Ashcraft v. Conoco, Inc.*, 218 F.3d 233, 302 (4th Cir. 2000), the court finds that the records contain confidential information that should be sealed. Plaintiff filed its Motion to Seal on the public docket reasonably in advance of the court issuing this order; thus, the court has provided public notice of Petitioner's request to seal—thereby allowing interested parties a reasonable opportunity to object. Plaintiff's request is the least drastic alternative to protect the confidential information at issue here. Plaintiff has requested to file under seal only the documents that contain information relating to Plaintiff's potential trade secrets. The Clerk of the Court shall maintain under seal the documents located at DE 7, 8, and 9 until further order of the court.

The court will hold an in-person hearing on the portion of Plaintiff's motion requesting a preliminary injunction on Wednesday, December 17, 2025, at 2:00 P.M. in Courtroom 1, Wilmington. Defendants shall respond to Plaintiff's motion for a preliminary injunction no later than Friday, December 12, 2025, at 12:00 P.M.

Additionally, the court reminds the parties that the burden remains on Plaintiff to demonstrate that further injunctive relief is appropriate. The court grants this TRO out of an abundance of caution–specifically based on the unique nature of the harm and based on Plaintiff's factual allegations–but offers no opinion regarding the ultimate merits of Plaintiff's action or whether a preliminary injunction is appropriate. This temporary restraining order dissolves on its own terms on December 17, 2025.

SO ORDERED this \_\_3d\_\_ day of December, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE